**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:24-cr-00320-JDB** |
| **EDWARD RICHMOND, JR.** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Edward Richmond, Jr. to the high end of the guidelines: 63 months imprisonment, 3 years' supervised release, and $2,000 in restitution.

## I.    INTRODUCTION

The defendant, Edward Richmond, Jr., participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution

Richmond, an ex-Army soldier who was previously court-martialed for shooting a hand-cuffed Iraqi citizen in the head with a rifle, joined the mob that brutally attacked police officers at the mouth of the Lower West Terrace Tunnel (the "Tunnel").  In full tactical gear, Richmond stayed at the front of the mob against officers in the Tunnel for almost two hours, during which he —aided in efforts to break the police line, and struck at officers with a baton while yelling, "we'll break you motherfucker!"  He also took a police helmet and police shield away from officers trying to defend the Capitol, passing them out to the mob after holding them over his head in a signal of encouragement to the rioters who were battling officers in the Tunnel. Richmond also passed a 6-foot wooden board into the Tunnel to aid other rioters in their violent attempts to overcome police and get into the Capitol building, as well as passing out furniture into the crowd that had been taken from the Capitol through a broken window.

The government recommends that the Court sentence Richmond to 63 months of incarceration for his conviction of violating 18 U.S.C. § 111(a) and (b).  A 63-month sentence reflects the gravity of Richmond's conduct.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3,

---

amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

2020 presidential election.

### *Assaultive Conduct in Tunnel Leading to the Doors of the*
### *West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Many of the most violent confrontations on January 6, 2021 occurred near an entrance to the Capitol Building in the Lower West Terrace (the "LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the "Tunnel"). That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the Tunnel is framed by a stone archway (the "Archway") that is a visual focal point at the center of the West Front of the Capitol Building, as circled in red below.

*Image 1[2] - The Tunnel on the Lower West Terrace*

On January 6, 2021, when rioters arrived at the doors behind this Archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza of the Capitol building just below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the

---

[2] Image 1 is taken from "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

second set of doors, physically engaging police with batons, poles, chemical spray, bottles, and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

The violent battle for control over the LWT entrance in the Tunnel and doorway area continued for more than two hours, during which time rioters repeatedly threatened, pushed, and assaulted police officers, engaging them in intense hand-to-hand combat.  Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m. It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including members of Congress.

**B.      Richmond's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

On January 6, 2021, Richmond originally attended the "Stop the Steal" rally at the Ellipse after he was hired as "security" for a group of approximately nine other individuals who were traveling from Ohio to Washington, D.C. to attend the rally.  Richmond stayed—along with that group—at the Phoenix Park Hotel while they were in Washington D.C. from January 5 through January 7, 2021.



*Image 2 – Richmond as "security" with other rally attendees on January 6, 2021*

In anticipation of potential violence, Richmond wore tactical gear, including a black helmet, tinted goggles, shoulder, elbow, and knee pads, an orange two-way radio, and a camouflage vest with a patch on his chest of the Louisiana state flag. While other members of his group headed back to the hotel after the rally, Richmond instead decided to make the approximately two-mile journey to the Capitol.

6



*Image 3 – Richmond at Ellipse*

By approximately 3:15 p.m., Richmond had positioned himself at one of the most violent attack points against police officers on January 6, 2021—the Tunnel.

### *Richmond's Assaultive Actions toward Officers in the Tunnel*

Wearing his tactical gear, Richmond forced his way to the front of the mob of rioters, to the mouth of the Tunnel, inside of which rows of police officers, some themselves wearing riot gear, were positioned, attempting to prevent rioters from entering the Capitol building.



*Image 4 – Richmond outside the Tunnel*

Richmond first entered the Tunnel around 3:16 p.m.  There, he joined with other rioters in using their collective force to push against the police line—in what has come to be referred to as a "heave ho," because rioters shouted this phrase as they coordinated their movements.



*Screenshot of Exhibit 1 – Richmond (circled in yellow) participating in heave-ho coordinated effort against officers*



*Image 5 – Richmond (indicated in yellow) participating in heave-ho movement against officers*

After pushing for over two minutes with the heave-ho attack coordinated with other rioters, Richmond left the inside of the Tunnel—carrying out with him a United States Capitol Police Officer's shield into the crowd.

10



*Image 6 – Richmond carrying a USCP shield*



*Image 7 – Richmond carrying out USCP shield*

***Richmond's assault on officers with a retractable metal baton***

Richmond was not done yet. At 4:57 p.m., armed with a retractable metal baton held high, he returned to the mouth of the Tunnel, where he had already been battling with officers and had witnessed their intensifying battle against rioters.



*Image 8 – Richmond (circled in yellow) with retractable baton approaching the mouth of Tunnel*



*Image 9 – Richmond approaching mouth of Tunnel*



*Screenshot of Exhibit 2 (open source video) at 1:48*

Before he struck, Richmond witnessed another rioter beside him spraying officers with a fire extinguisher as the mob cheered.  It was then that Richmond positioned himself further toward the front, getting ready to strike.



*Image 10 – Richmond ready to strike officers with a baton*



*Exhibit 3 (BWC) at 1:02*

Though Richmond's violent actions toward police speak for themselves—Richmond made his intentions clear to officers, yelling at them, twice, "ya, we'll break you motherfucker!" (Exhibit 4 at 0:25 - 0:33). Then Richmond hit officers' shields at least twice more—holding up his right arm with the baton and strategically striking when officers were most open to attack.



*Exhibit 4 (BWC) at 0:37 seconds – Richmond yelling at officers*



*Exhibit 5 (BWC) at 0:47 seconds*

***Further Aiding the Mob By Supplying Weapons and Carrying Furniture out of the Capitol***

In addition to his direct assault against officers, at this vulnerable point of the officers' valiant efforts to hold the Capitol, Richmond helped other rioters by carrying a six-foot-long solid wooden board over the heads of rioters—passing it to the mob to use against officers in the Tunnel.



*Image 11 – Richmond passing a long wooden board to rioters to use against police*

Richmond also carried out Congressional furniture from a broken window of the Capitol near the mouth of the Tunnel. He pumped it up in the air several times over his head and shouted, drawing huge cheers from the crowd and spurring the rioters on in their violent attack against police.

17



*Image 12 – Richmond lifting chair down from broken window in the Capitol*



*Image 13 – Richmond pumping the chair in the air and showing the mob*

In addition to taking furniture out of broken windows of the Capitol, Richmond also held MPD officer's police helmet above his head and showed it to the crowd in a display of encouragement for the violent rioters fighting against police officers in the Tunnel.



*Screenshot of Exhibit 6 at 0:05 seconds – Richmond holding up police helmet*

Richmond's decisions to take shields and helmets from officers at the Capitol that day had three major impacts on the officers' ability to protect the Capitol. First, it made them more defenseless against the growing mob. Second, it allowed rioters to use this protective gear against officers. Richmond handed the helmet back to a rioter who immediately put the MPD helmet on and strapped into it, continuing to face off against the police. Finally, Richmond's actions raising the helmet and the shield up into the air and pumping his fists added to the mob's enthusiasm.

## III.    THE CHARGES AND PLEA AGREEMENT

On July 12, 2024, the United States filed an Information charging Richmond with 18 U.S.C. 111(a)(1) and (b). On, August 15, 2024, Richmond was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

20

## IV.    STATUTORY PENALTIES

Richmond now faces sentencing for Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) and (b).

As noted by the Plea Agreement and the Presentence Report issued by the U.S. Probation Office, Richmond faces up to 20 years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The United States agrees with the analysis in the PSR.  *See* PSR at ¶¶ 34-46.  That Guidelines analysis is as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2) | Specific Offense Characteristics **(Dangerous weapon)** | **+4** |
| U.S.S.G. § 2A2.2(b)(7) | Convicted pursuant to 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(a)-(b) | Applicable Adjustments Official Victim Adjustment | **+6** |
| **Combined Offense Level** | | **26** |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1) | | <u>-3</u> |
| Total Adjusted Offense Level | | **23** |

*See* Plea Agreement at ¶ 5(A).

As agreed upon by the parties, Section 4C1.1 does not apply in this case. Even if this had not been agreed upon, the application of 4C1.1 would be inappropriate here where the defendant used "violence or credible threats of violence" per Section 4C1.1(a)(3) and was in possession of "a firearm or other dangerous weapon" per Section 4C1.1(a)(7). Because Richmond hit officers' shields multiple times with a retractable metal baton, the application of Section 4C1.1 is not available to Richmond under the law.

The U.S. Probation Office calculated the defendant's criminal history as category II, which is higher than the original calculation set forth in the plea agreement, but is still allowed under the agreement. Plea Agreement, at 4; PSR ¶ 51. The United States and the defendant agree with this calculation. *See* ECF No. 35 (Def. Sent. Memo), at n.1. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 23, Richmond's Guidelines imprisonment range is 51 to 63 months' imprisonment. The defendant's plea agreement contains an agreed-upon offense level calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Richmond's felonious conduct on January 6, 2021 was a violent force in the massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power,

and throwing the United States into a Constitutional crisis. Richmond, decked out in tactical gear, contributed to the heave-ho coordinated push against officers in the Tunnel before mounting his own attack with a baton—striking officers' shields in an attempt to break the police line. He assisted and riled up the riotous mob, passing a shield and a helmet out of the tunnel to other rioters, carrying a six-foot-long wooden board into the tunnel, and passing furniture through a broken window to the crowd.

The nature and circumstances of Richmond's offense was of the utmost seriousness, and fully support the government's recommended sentence of 63 months.

**B. The History and Characteristics of the Defendant**

Richmond is a former Army soldier whose criminal history shows a clear pattern of animosity toward authority, resulting in violent behavior toward officers. This behavior was on full display during his violent attack on police officers protecting the Capitol on January 6, 2021. Richmond's significant and violent history of arrest and conviction weighs in favor of a lengthy period of incarceration:

- In November 2000, Richmond was convicted of disturbing the peace, and resisting officers. (*See* Exhibit 7, Excerpts from Military Records)

- In April 2001, Richmond was arrested for possession of cocaine and marijuana, and for conduct during that arrest, he was also arrested for battery on a police officer. (*See* Exhibit 7)

- In May 2001, he was convicted of driving under the influence, and during that arrest was arrested for public profanity and for resisting arrest by officers. (*See*

Exhibit 7)

- In 2004, Richmond—then serving in the United States Army—was convicted of manslaughter after shooting a hand-cuffed Iraqi cow herder in the head with his rifle. Richmond was sentenced to three years of military confinement and dishonorably discharged. His military parole term was completed in 2007. (*See* Exhibit 8, criminal history, and Exhibit 9, redacted Court Martial and Military Discharge)

- In 2012, Richmond was arrested for domestic abuse battery. (*See* Exhibit 8)

Each of the three arrests from 2000 to 2001 involve not just the underlying crimes themselves, but a pattern of Richmond resisting officers and/or battery on police officers. When Richmond transitioned to military service, he was again charged with and convicted of violent conduct: this time for killing an Iraqi cow herder by shooting him in the head with an M4, the upgraded military version of an AR-15 civilian gun. He was sentenced to three years in military confinement (*See* Exhibit 10) in Fort Sill, during which time he had a large file of 183 observation reports. (*See* Exhibit 9, observations during Military Confinement.) These included several instances of Richmond threatening Military Prison Guards, including:

- Refusing to give a book to a Guard stating, "I'm not giving it to you and if you try to take it am going to fight."

- Threatening any Guard who tried to enter his cell, stating "That's why I do pushup[s] all the time, so I can be ready for shit like this."

(*See* Exhibit 9, observations during Military Confinement)

24

Far from complying with the law since his release from military confinement for voluntary manslaughter, Richmond was arrested for domestic abuse battery in 2012. And despite his status as a convicted felon who was not authorized to possess firearms, at the time of his arrest in January 2024, he was in illegal possession of an unsecured AR-15 assault rifle with three fully loaded magazines in the home he shares with his minor child. ECF No. 15, at 2-3.

These are precisely the facts that supported Chief Judge Boasberg's decision to detain the defendant pending trial. ECF No. 15, at 3.

All of this is on top of the conduct he is being sentenced for now: the violent assault of police officers on January 6, 2021 with a deadly weapon by hitting police officers with a baton while officers tried to protect the Capitol from being breached at the mouth of the Tunnel.

Richmond's violent crimes against police officers on January 6, including hitting them with a baton as they tried to repel rioters from the Tunnel, were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of violent offenses and blatant disregard for the law. Richmond's history and characteristics weigh heavily in favor of a lengthy term of incarceration.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Richmond's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Here, a significant period of incarceration is needed to deter this defendant from future crimes like those he committed on January 6, 2021.

Although Richmond has now expressed remorse and contrition, his flagrant and

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

dangerous disregard for the law was clear from his violent conduct that day despite having already served time in military confinement for involuntary manslaughter, and from his illegal possession of an AR-15 assault rifle despite being prohibited him from owning any firearms at all.

The Court must now sentence someone who has already not been deterred by his three-year court-martial. He has also not complied with a crucial restriction of his release—instead, keeping in his home a loaded AR-15 assault rifle. The sentence now must reflect those concerning choices, as well as his violent conduct on January 6, 2021.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added).  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.  "As the qualifier 'unwarranted' reflects, this

provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]  "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities."  *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Nicholas Languerand*, Case No. 1:21-CR-00353, the defendant, after witnessing the "heave ho" coordinated efforts from above the Tunnel area, proceeded to climb down to the Tunnel and throw multiple sticks and debris, including a sizeable orange bollard, at officers inside the Tunnel.  Languerand also grabbed onto a police shield and held it above his head.  Languerand pled guilty to 18 U.S.C. § 111(a) and (b)—with a criminal history category of

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.  *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."  The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

I and a guidelines range of 46-57 months. This Court sentenced Languerand to 44 months' incarceration. However, Richmond's case differs from Languerand's in two important respects. First, Richmond's conduct is more prolonged against officers in the Tunnel that day, given that Richmond actually took part in the "heave ho" efforts inside the Tunnel. His conduct was also more pointedly violent against officers in that Richmond picked up a police baton and physically attacked officers with it while decked out in full riot gear. Second, Richmond has a higher criminal history Category II. Languerand's criminal history Category I with zero criminal history points pales in comparison to Richmond's Category II and specific prior criminal conduct. Given the aggravating factors in this case, as reflected in the higher guideline range and recommendation from the government for Richmond, the Court should impose sentence of 63 months of incarceration—and could do so without creating an unwarranted disparity.

In *United States v. Robert Scott Palmer*, Case No. 1:21-CR-00328, the defendant's conduct was similar to Richmond's in several respects. Palmer sprayed officers with a fire extinguisher and then threw the empty metal extinguisher at officers. Palmer also engaged in battle with officers at the Tunnel and threw several objects at police officers in the tunnel, including a long wooden plank. Palmer pleaded guilty to a violation of 18 U.S.C. § 111(a) and (b)—with a criminal history category of I and a guidelines range of 63-78 months (with no reduction under U.S.S.G. § 3E1.1). Judge Chutkan sentenced Palmer to 63 months' incarceration, 36 months' supervised release, and $2,000 restitution. Balancing the aggravating and mitigating factors between Richmond and Palmer, a sentence of 63 months' incarceration for Richmond would not create an unwarranted disparity.

30

In *United States v. Thomas Ballard*, Case No. 1:21-CR-00553, Ballard—like Richmond—also used a retractable baton to repeatedly strike and hit police officers in the Tunnel around the same time as Richmond.  Ballard also threw a tabletop and other objects at officers and was in the same area, within several feet, as Richmond during his attacks.  Like Richmond, he plead guilty to 18 U.S.C. § 111(a) and (b)—but Ballard's guidelines were lower at 46 to 57 months, as he had a lower criminal history category of I.  Judge Lamberth sentenced Ballard to 54 months' incarceration.  Unlike Ballard, who was dressed in jeans and a backwards cap, Richmond was in full riot gear that day when he approached the Capitol—with a helmet, padding, and goggles he brought in anticipation of violence.  Richmond also has a higher criminal history category of II.  Richmond's aggravating factor of preparing for violence and the difference in criminal history mean that a 63-month sentence requested would not create an unwarranted sentencing disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."  *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property. . . including any offense committed by fraud or

31

deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Generally, restitution must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the the restitution statutes also authorize a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Richmond must pay $2,000 in restitution, which reflects in part the role Richmond played in the riot on January 6.[6] Plea Agreement, at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Richmond's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 108.

More specifically, the Court should require Richmond to pay $2,000 in restitution for his

---

[6] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

convictions on Count One.  This amount fairly reflects Richmond's role in the offense and the damages resulting from his conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.  Accordingly, such a restitution order avoids sentencing disparity.

## VIII.    FINE

The defendant's conviction for a violation of 18 U.S.C. § 111(a), (b) subjects him to a statutory maximum fine of $250,000.  *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).  The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).  Here, Richmond's financial assets set forth in the PSR, and his representation by appointed counsel, suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 63 months' incarceration, followed by three years' supervised release, and $2,000 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES

United States Attorney
D.C. Bar No. 481052


By:    */s/ Victoria A. Sheets*
       VICTORIA A. SHEETS
       Assistant United States Attorney
       NY Bar No. 5548623
       601 D Street, N.W.
       Washington, D.C. 20001
       (202) 252-7566
       Victoria.Sheets@usdoj.gov